Roger SCHENDEL, et al., Respondents,

v.

HENNEPIN COUNTY MEDICAL CENTER, et al., Defendants,

Neurosurgical Associates, Ltd., et al., Appellants,

and

Great West Casualty Company, Intervenor, Respondent.

No. C0–91–964.

Court of Appeals of Minnesota.

May 5, 1992.

Review Denied July 16, 1992.

Terence J. McCloskey, New Brighton, Arlo H. Vande Vegte, Arlo H. Vande Vegte, P.A., Long Lake, for Roger Schendel.

Greer E. Lockhart, Charles E. Lundberg, Mark P. Hodkinson, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for appellants.

Mark A. Gwin, Cousineau, McGuire & Anderson, Chartered, Minneapolis, for respondent.

Considered and decided by KLAPHAKE, P.J., and FORSBERG, and DAVIES, JJ.

## OPINION

KLAPHAKE, Judge.

Appellants Dr. Mahmoud Nagib and Neurosurgical Associates, Ltd. challenge the trial court's denial of JNOV, alleging respondent Roger Schendel failed to prove the existence of a physician-patient relationship while Schendel was a patient at Hennepin County Medical Center and claim that errors in the verdict form and instructions to the jury, evidentiary errors, and the jury's award of excessive and speculative damages require a new trial. Appellants also contend that the trial court erred as a matter of law in holding them liable for the entire amount of damages. We affirm.

## FACTS

Respondent Roger Schendel sustained multiple serious injuries in a truck roll-over accident on June 26, 1984. He was taken to Waconia Hospital and later transferred to Hennepin County Medical Center ("HCMC") because of the severity of his injuries.

Upon admission to HCMC, Schendel was treated in the stabilization room by a team of medical personnel consisting of five residents and two staff physicians from various specialties including emergency medicine, general surgery, plastic surgery, cardiovascular pulmonary (CVP) surgery and neurosurgery. All of the resident physicians were employees of HCMC. The general and emergency room staff physicians, however, were employees of Hennepin Faculty Associates ("HFA"), an independent group of private physicians that contracted with HCMC to provide staff physician coverage.

The team of physicians treating Schendel did not immobilize his neck. Instead, the physicians reviewed x-rays taken both at Waconia and HCMC and determined that no cervical spinal fracture was present. Dr. Michael Yaron, a neurosurgery resident, indicated the absence of cervical spinal injury in patient notes dated June 26, 1984, which were countersigned by staff neurosurgeon Dr. Mahmoud Nagib.

Dr. Hill, a staff radiologist, also examined the x-rays but stated in a typed report dated June 26, 1984, that the critical "swimmer's view" x-ray was of such poor quality that a cervical spinal fracture could not be excluded, and recommended that the x-ray be repeated. The x-ray was not repeated, and none of the admitting physicians recall having seen Dr. Hill's report. The parties do not dispute that the failure to immobilize Schendel's neck upon admission and the failure to repeat the swimmer's view x-ray were deviations from accepted medical practice.

On June 26, Schendel was transferred from the emergency room to the general surgery service after his condition stabilized. At that time, the attending general surgeons requested continuing consultation from the neurosurgery service.[1] The neurosurgery service consulted on Schendel from June 26 until the date of his discharge

---

1. Appellants Neurosurgical Associates, a group of neurosurgeons consisting of appellant Nagib and his partners, provided staff neurosurgical services to HCMC pursuant to a contract. The neurosurgical residents, employed by HCMC, provided the day-to-day patient care. At the time of Schendel's admission these residents included Dr. Isaac Wolf, the chief resident, and Dr. Michael Yaron, who was then a second-year emergency medicine resident assigned to a three-month rotation on neurosurgery as a part of his training.

on July 17, 1984. Although his neurological status slowly improved during this time, Schendel remained somewhat confused, had memory problems and became increasingly agitated.

On July 17, 1984, Schendel was transferred from HCMC to Sister Kenny Institute. His discharge order called for accelerated patient activity and rehabilitation therapy but, after one week, he began to experience symptoms of neurological damage, including decreased grip strength and arm coordination.

Sister Kenny physicians evaluated Schendel and discovered a fracture and dislocation of his C6 vertebra. They referred Schendel to Dr. Nagib, who performs most of Sister Kenny's neurosurgery. Schendel was then transferred from Sister Kenny to Abbott–Northwestern Hospital. Dr. Nagib examined him on July 25, 1984, and began a course of treatment, starting with traction, in an attempt to reduce the fracture and dislocation.[2] When traction was unsuccessful, Dr. Nagib and his partner, Dr. Erich Wisiol, performed cervical fusion surgery on July 27, 1984.

Three days after the surgery, Dr. Nagib ordered that Schendel return to Sister Kenny for routine mobilization therapy and rehabilitation. Schendel was discharged from Sister Kenny on September 6, 1984, but remained permanently disabled. Among other injuries, he suffers from decreased ability to use his hands and arms, severe neck pain, and permanent causalgia (extreme sensitivity to touch).

In 1986, Schendel sued all of the physicians who had treated him. Great Western Casualty Company intervened to pursue subrogation. Several of the defendant physicians were dismissed during discovery. Immediately before trial, Schendel and intervenor negotiated a settlement with HCMC and its physicians for $90,000, which was $10,000 less than the statutory cap on their liability. The trial court approved the settlement, but stated that the

non-settling defendants remained jointly and severally liable.

Trial commenced on October 10, 1990. Several other defendants were dismissed during trial, and, at the conclusion of the evidence only Dr. Nagib and Neurosurgical Associates remained as defendants. By special verdict, the jury found "Dr. Nagib/Neurosurgical Associates" 42 percent at fault and "HCMC" 58 percent at fault for Schendel's disabilities, and found damages of $1,689,241.77. The trial court ordered judgment against Dr. Nagib and Neurosurgical Associates for $1,599,241.77, the full amount of the verdict less the settlement amount. Dr. Nagib and Neurosurgical Associates brought motions for JNOV or a new trial. The court denied the motions and ordered the judgment reduced by an additional $10,000, to reflect the full then-applicable statutory cap on the liability of the settling defendants. In a subsequent order, the court awarded Schendel costs, disbursements, and pre-verdict interest, ordering judgment for $2,123,180.12. Dr. Nagib and Neurosurgical Associates appeal.

### ISSUES

1. Does the evidence support a finding of a physician-patient relationship?

2. Did the trial court err in the manner of its submission of the case to the jury?

3. Does the evidence support the damage award?

4. Did the trial court abuse its discretion in its evidentiary rulings?

5. Did the settlement and release agreement between Schendel and HCMC destroy joint and several liability between HCMC and appellants?

### ANALYSIS

#### I.

Physician–Patient Relationship.

An essential element of proof in a medical malpractice case is the existence of

---

**2.** The parties do not dispute that a physician-patient relationship existed between Dr. Nagib

and Schendel from this date forward.

a physician-patient relationship. *McElwain v. Van Beek*, 447 N.W.2d 442, 446 (Minn.App.1989), *pet. for rev. denied* (Minn. Dec. 20, 1989). Appellants contend that the trial court erred in denying their motion for JNOV because Schendel failed to prove the existence of a physician-patient relationship between him and Dr. Nagib or Neurosurgical Associates during the period following Schendel's admission to HCMC. We disagree.

■ Denial of a motion for JNOV is a question of law which we review de novo. *Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 14 (Minn.1979). On appeal from a trial court's refusal to grant a motion for JNOV, we review the entire record to determine whether there is any competent evidence reasonably tending to sustain the verdict. *Benson v. Rostad*, 384 N.W.2d 190, 194 (Minn.App.1986). We will not reverse the verdict unless the evidence against the verdict is practically conclusive. *Sandhofer v. Abbott–Northwestern Hosp.*, 283 N.W.2d 362, 365 (Minn.1979).

Here, the record reasonably supports the jury's implicit finding that a physician-patient relationship existed between Schendel and Dr. Nagib at HCMC. *See* Minn. R.Civ.P. 49.01(a). Under the terms of the written contract between Dr. Nagib/Neurosurgical Associates and HCMC, Dr. Nagib and Neurosurgical Associates were obligated to provide not only direct patient care, but also "guidance and direction" to HCMC residents and interns. Expert testimony established that the standard of care in a metropolitan teaching hospital requires the input and expertise of a staff physician whenever a request for a specialty consultation is made. The staff physician is ultimately responsible for the patient's care and supervision of "everybody down the line from chief resident, to junior resident, to intern, to medical student." Here, it is undisputed that the HCMC neurosurgery residents continued to follow Schendel throughout his hospitalization at HCMC. Thus, even if, as appellants assert, Dr. Nagib and his partners did not then personally see or evaluate Schendel, the jury could have concluded that they were none-theless obligated to do so under the terms of their contract with HCMC and accepted medical practice.

The record also contains other evidence supporting an inference that Dr. Nagib was, himself, directly involved in Schendel's care. Dr. Nagib's signature and billing number appeared beneath Dr. Yaron's June 26 note ruling out a cervical spinal fracture. This evidence implies that Dr. Nagib at a minimum took responsibility for, and approved of, Dr. Yaron's diagnosis. Dr. Nagib, himself, testified that where a resident note states a cervical spinal fracture diagnosis is negative, the attending staff physician must examine the x-rays before countersigning. Finally, the presence of Dr. Nagib's name and office telephone number on the outside of Schendel's x-ray jacket provided an inference that Nagib was involved in Schendel's care while Schendel was hospitalized at HCMC. We conclude this evidence and its reasonable inferences permitted the jury to conclude that a physician-patient relationship existed between Dr. Nagib and/or Neurosurgical Associates and Schendel during Schendel's hospitalization at HCMC.

## II.

Errors in Submission of Case to Jury.

■ Appellants also argue that the trial court erred in (1) failing to submit separate verdict questions on the respective culpability of HCMC physicians, HFA physicians, and HCMC; (2) submitting a question on the independent fault of Neurosurgical Associates; and (3) submitting an instruction which permitted an award of damages sustained as a result of the "early therapy to the neck." Appellants argue that these errors entitled them to a new trial. Again, we disagree.

■ In a negligence case, a jury must have the opportunity to consider the separate fault of all persons involved, even if some are not parties to the lawsuit, and even when the person cannot be liable to the plaintiff or other tortfeasors because of prior releases. *Lines v. Ryan*, 272 N.W.2d 896, 902–03 (Minn.1978). The form that

the special verdict will take in such a case is, however, within the trial court's discretion. *See* Minn.R.Civ.P. 49.01(a); *Hill v. Okay Constr. Co.*, 312 Minn. 324, 340, 252 N.W.2d 107, 118 (1977). Here, the trial court merely aggregated all of the HCMC physicians on the special verdict form. Each of the HCMC physicians involved in Schendel's care was, however, listed by name on the verdict form. The jury thus could consider in its deliberations the separate fault of each. Moreover, the evidence was arguably consistent with a distinction between the fault of the HCMC group in failing initially to immobilize Schendel's neck, and the fault of the neurosurgical service to diagnose the fracture at any time during Schendel's stay at HCMC, despite the fact that he showed increasing signs of neurological damage.

The record also shows that the trial court did not err in submitting the fault of Neurosurgical Associates to the jury. Schendel's second amended complaint clearly alleges the negligence of Neurosurgical Associates as well as Dr. Nagib. The contract between HCMC and Neurosurgical Associates established a basis for Neurosurgical Associates' liability. Substantial testimony, including that of Dr. Nagib, established Neurosurgical Associates' responsibilities under both its contract with HCMC and accepted medical practice as specialist consultants. We conclude the trial court was within its discretion in including Neurosurgical Associates on the special verdict form. *See Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn.1984) (where evidence reasonably tending to prove the existence of a fact issue exists, the trial court may submit it to the jury).

Appellants finally contend that the trial court erred in including language referring to "early therapy to the neck" on the damages interrogatory. A verdict form may be upheld as submitted where the charge, given as a whole, conveys a clear and correct understanding of the law to the jury. *Smith v. Kahler Corp.*, 297 Minn. 272, 282, 211 N.W.2d 146, 153 (1973). The trial court twice instructed the jury that this interrogatory was a damages

question only, and that they were not to consider the answer to it on other questions in the verdict form. Moreover, substantial evidence suggested that "early therapy" referred to and encompassed the actions of Dr. Nagib and Neurosurgical Associates in failing to immobilize and treat Schendel's neck fracture *before* discharging him to Sister Kenny for physical rehabilitation. We conclude that the trial court did not abuse its discretion in the manner in which it submitted the case to the jury.

### III.

Excessive and Speculative Damages.

Appellants argue that the trial court erred in denying their motion for a new trial because the jury awarded damages as a result of passion and prejudice and further contend the evidence does not support the award. Appellants claim that Schendel's injuries resulted primarily from the truck roll-over accident and not from the delay in diagnosis of his neck fracture. Appellants also suggest that Schendel's injuries do not warrant the damages awarded. We disagree.

A new trial on the issue of damages will be ordered where the verdict is so excessive that it could only have been rendered because of passion or prejudice. *Seim v. Garavalia*, 306 N.W.2d 806, 813 (Minn.1981). Upon review, we determine whether the trial court abused its discretion in denying a new trial. *Hennen v. Huff*, 388 N.W.2d 408, 411 (Minn.App. 1986), *pet. for rev. denied* (Minn. Aug. 13, 1986). We must consider the evidence in the light most favorable to the verdict, and we will set aside the verdict only if it is "manifestly and palpably contrary to the evidence." *Levienn v. Metropolitan Transit Comm'n*, 297 N.W.2d 272, 273 (Minn. 1980).

The record supports the conclusion that Schendel's injuries resulted from the failure to diagnose and treat his broken neck, rather than from the accident. Experts testified that Schendel's injuries are permanent and progressive, and were caused by

nerve root damage which occurred when the fractured vertebra subfluxed, or slid, over the vertebra underneath it. The testimony established that these injuries were a direct result of the initial failure to diagnose the fracture and the failure to immobilize Schendel's neck at the time of admission. Further, the experts testified Schendel's injuries were exacerbated by the initiation of physical therapy too soon after the neck fusion surgery. Substantial testimony established the severity and permanence of Schendel's injuries, his inability to work, and his need for continued medical treatment and home health assistance. In addition, Schendel presented evidence of his anticipated wage loss and emotional damage. This evidence, viewed in the light most favorable to the verdict, reasonably supports the damage award.

### IV.

Evidentiary Rulings.

■ Appellants argue that they are entitled to a new trial because the trial court made numerous evidentiary rulings which deprived them of a fair trial. Evidentiary rulings are within the sound discretion of the trial court and will be reversed only where that discretion has been clearly abused. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983). We do not agree that any of the claimed errors constituted such an abuse of discretion.

■ Appellants first contest the admission of the portion of Schendel's x-ray jacket which bore the pencilled-in names of Dr. Nagib and several other physicians, claiming that the evidence was untrustworthy and lacked sufficient foundation. We disagree. The x-ray jacket was admissible because it tended to impeach Dr. Nagib's testimony that he was not involved in Schendel's care at HCMC. *See* Minn. R.Evid. 801(d)(1)(A) advisory committee's note; *State v. Buschkopf*, 373 N.W.2d 756, 771 (Minn.1985) (evidence offered for impeachment purposes falls outside the hearsay rule altogether). Nor did the trial court err in admitting testimony of Schendel's friends regarding Schendel's pain, emotional state, and activity level under the "state of mind" exception to the hearsay rule. *See* Minn.R.Evid. 803(3) advisory committee's note.

■ Appellants next argue that the trial court erred in refusing to admit financial information allegedly relevant to Schendel's incentive and motivation to return to work. The trial court noted, and we agree, that the record contains absolutely no evidence that any of Schendel's injuries were feigned, thus exclusion of the evidence was not erroneous. In addition, appellants' claim that the trial court allowed Schendel to call witnesses and use exhibits not disclosed prior to trial is without merit. The record shows that Schendel disclosed the witnesses and exhibits in advance and that any "surprise" testimony from these witnesses was not prejudicial.

■ Appellants also contend that allowing Schendel's expert to testify on rebuttal before appellants rested deprived them of a fair trial. We disagree. The order of proof is largely within the trial court's discretion and will not be reversed absent an abuse of that discretion. *See Sports Page, Inc. v. First Union Management, Inc.*, 438 N.W.2d 428, 430 (Minn. App.1989). We observe no abuse of discretion where the trial court's decision was based upon legitimate scheduling concerns, and where appellants were allowed to recall both Dr. Nagib and another key expert to testify on the points raised in rebuttal.

■ Finally, appellants' contention that misconduct by Schendel's counsel warranted a new trial is without merit. *See Jack Frost, Inc. v. Engineered Bldg. Components Co.*, 304 N.W.2d 346, 352 (Minn.1981) (refusal to grant new trial will be reversed only where misconduct was "so prejudicial that it would be unjust to allow the result to stand"). We have examined the record and conclude that none of the claimed misconduct rises to the level necessary to warrant reversal.

### V.

Liability for Damages.

■ Appellants contend the trial court erred in ruling that they remained jointly

and severally liable for the entire amount of damages, rather than their percentage share of the causal fault. Appellants argue that joint liability was destroyed when HCMC entered into a *Pierringer* release with Schendel. We disagree.

The record demonstrates that the release entered into between HCMC and Schendel was not a true *Pierringer* release. A true *Pierringer* release limits each joint tortfeasor's liability to that part of the award attributable to that tortfeasor's percentage of causal fault and destroys joint liability between the settling defendant and nonsettling defendant. *Hosley v. Armstrong Cork Co.*, 383 N.W.2d 289, 292 (Minn.1986); *Frey v. Snelgrove*, 269 N.W.2d 918, 920 n. 1 (Minn.1978). The *Pierringer* release thus operates to impute the liability of the settling defendant to the plaintiff. *Frey*, 269 N.W.2d at 920 n. 1. Here, the parties to the agreement, as well as statements made by defense counsel, indicate that the release was not meant to extinguish joint and several liability between HCMC and appellants.

Moreover, appellants were in no way prejudiced by the agreement. Regardless of the percentage of fault that could have been attributed to HCMC, its liability was limited to $100,000. *See* Minn.Stat. § 466.-04, subd. 1(a) (1982). As a result, appellants were no worse off than if the release had not been entered. The trial court thus did not err in finding that the release was not, and was not intended to be, a true *Pierringer* release.

 Appellants also argue that because intervenor was a separate claimant entitled to a separate $100,000 cap in connection with its claim against HCMC, and because the settlement agreement required Schendel to indemnify HCMC for all contribution claims, Schendel should indemnify HCMC for all contribution claims up to $200,000, rather than $100,000. We disagree. The supreme court has clearly stated that a medical provider with a subrogated claim for medical expenses is not a separate claimant entitled to a separate liability cap under Minn.Stat. § 466.04. *Rowe v. St. Paul Ramsey Medical Ctr.*, 472 N.W.2d

640, 644 (Minn.1991). HCMC's liability, and thus Schendel's indemnity obligation, therefore was limited to $100,000.

DECISION

The trial court did not err in denying appellants' motion for JNOV where the evidence, and its reasonable inferences, support the jury's finding that a physician-patient relationship existed between appellants and Schendel. Appellants are not entitled to a new trial where the trial court did not abuse its discretion in the manner in which the case was submitted to the jury or in its various evidentiary rulings, and where the evidence reasonably supported the jury's award of damages. The trial court did not err in holding appellants liable for the full amount of damages where the evidence showed a settlement agreement entered into between Schendel and HCMC was not a true *Pierringer* release.

Affirmed.